STATE OF CONNECTICUT *v.* DEXTER LEE
(10836)
(10837)

FOTI, LAVERY and HEIMAN, Js.

Argued May 3—decision released July 20, 1993

*Christine Perra,* special public defender, for the appellant (defendant).

*Marjorie Allen Dauster,* deputy assistant state's attorney, with whom, on the brief, were *John T. Redway,* state's attorney, and *Bernadette Conway,* assistant state's attorney, for the appellee (state).

HEIMAN, J. The defendant appeals from judgments of conviction, rendered after a jury trial, of possession of a narcotic substance with intent to sell in violation of General Statutes § 21a-278 (b) and improper use of a motor vehicle registration in violation of General Statutes § 14-147 (c) under one information, and of risk of injury to a child in violation of General Statutes § 53-21 and reckless endangerment in the first degree in violation of General Statutes § 53a-63 under a separate information. The jury acquitted him of criminal attempt to commit assault in the first degree and the lesser included offenses thereof.

On appeal, the defendant asserts that (1) the search of his car violated his state and federal constitutional rights to be free from unreasonable searches because (a) the actions of the Middletown police department constituted a search for fourth amendment purposes and (b) the search of his car did not fall within any of the recognized exceptions to the warrant requirement, (2) the narcotics that were found should have been excluded because the state failed to establish that the evidence was in an unchanged condition, (3) the state produced insufficient evidence to convict him under General Statutes § 21a-278 (b), (4) the trial court's denial of his request to remove counsel and for a continuance denied him his due process rights, (5) the trial

court's charge improperly highlighted the admission of a witness' inconsistent statement thereby prejudicing the defendant, and (6) the trial court improperly consolidated for trial two informations filed against him and the resulting prejudice was beyond the curative power of the court's instructions. We affirm the judgment of the trial court.

The jury could have reasonably found the following facts. On May 5, 1989, at approximately noon, Aleta Renee Jenkins, who lived at 12 Roosevelt Drive in Middletown, was walking home from her girl friend's house. She saw her nine year old daughter across the street, waited until the daughter crossed the street and the two proceeded to their front door. At that moment, the defendant came out of the residence at 6 Roosevelt Drive. As Jenkins turned the doorknob to enter her house, she heard the defendant call her name.[1] She turned and saw the defendant squatting. She saw a gun in his hand and realized that he was aiming it at her. She also noticed that the defendant's cousin, Curtis Flood, was standing next to him. Jenkins grabbed her daughter who was standing behind her and ran into the house to hide. As she did this, she heard a gun shot. She testified that the defendant then got into his red Alfa Romeo Milano and drove away. Her daughter testified that she heard the defendant call her mother's name and saw the defendant holding a gun. Scott Jenkins, Aleta Jenkins' brother, who was inside the house at the time of the incident, also testified that he heard a shot and something hit the house.[2]

---

[1] The night before, the defendant and another individual were involved in a fight on Roosevelt Drive. Aleta Renee Jenkins testified that she was peripherally involved in the incident.

[2] The defendant and Curtis Flood both testified that while the defendant yelled to Aleta Renee Jenkins, the defendant neither possessed a gun nor fired one at her and her daughter.

During an investigation, Sergeant George Dingwell of the Middletown police found a copper coated lead bullet that was fired from a .38 caliber weapon lodged in the southwest corner of Jenkins' house.

On May 10, 1989, Glen Partridge, a self-employed automobile recovery agent at Coastal Auto Recovery, received an assignment from his client, Ford Motor Company (Ford), to repossess the defendant's 1988 silver four door Subaru GL. Ford supplied Partridge with the defendant's two known addresses in Middletown, 226 Ridgefield Drive and 54 Roosevelt Drive.

At 5 a.m., Partridge and an assistant went to Middletown to repossess the vehicle. As part of their normal course of business and out of courtesy, they notified the police of their intentions and showed the desk sergeant at the Middletown police department their order to repossess the vehicle. Partridge and his assistant then proceeded to the defendant's Roosevelt Drive address because Ford had informed them that the defendant was living there. Donald Anderson, a Middletown police officer, met Partridge and his assistant at the Roosevelt Drive address, where Partridge found the defendant's car. Partridge observed identifying characteristics including the vehicle identification number using the information that Ford provided him. Partridge hooked up the vehicle to a wrecker and towed the car away from Roosevelt Drive.

As they left Roosevelt Drive, Anderson stopped Partridge. Anderson checked the license plate numbers with the department of motor vehicles and discovered that the plate number did not match the registration for that vehicle. He removed the plate and Partridge replaced it with a transport plate. Partridge then towed the vehicle to the Middletown police department to inventory its contents and to fill out a report describing the condition of the vehicle and its mileage. Par-

tridge testified that his company and Ford require that he inventory repossessed vehicles to ensure that the consumer's property is returned and that the vehicle does not contain any contraband or firearms. He also testified that he inventories the vehicle away from the location where he repossesses it to avoid breach of the peace. He further testified that he conducts an inventory of all of the vehicles he repossesses and that half of the time he conducts this inventory at the local police station.

While Partridge and his assistant gained entry to the locked passenger compartment of the vehicle and inventoried it, Anderson stood nearby. Anderson testified that he observed the inventory to ensure that if contraband were found he could preserve the chain of custody. He did not, participate, however, in the inventory process. Inside the Subaru, Partridge and his assistant found personal effects such as clothes, papers, a hard hat, a child's toy and safety glasses. Partridge also opened and inventoried the trunk. He then picked the lock to the locked glove compartment. Inside that compartment, he found personal papers, papers dealing with the vehicle, pens, pencils, and a partially opened tinfoil package that he thought might be a brownie. He handed the package to Anderson who opened it. Anderson discovered that the package contained a white substance in rock form. On the basis of his training and experience, Anderson thought that the package contained narcotics.

During the trial, Flood testified that the defendant had the only key to the automobile. This key opened the car's door, trunk and glove compartment, and started the ignition. While Flood testified that he often used the car for work and on weekends, he stated that he did so only with the defendant's permission and had

to obtain the key from the defendant. He further testified that the narcotics found in the glove compartment were not his.

After a five day trial, in which two informations were consolidated, the jury found the defendant guilty of possession of narcotics with intent to sell, improper use of a motor vehicle registration, risk of injury to a child, and reckless endangerment. This appeal ensued.[3]

I

The defendant first asserts that the trial court improperly denied his motion to suppress. He argues that the search of his automobile violated his federal and state constitutional rights to be free from unreasonable searches.[4] In making this claim, the defendant argues that the actions of the Middletown police department constituted a search for fourth amendment purposes and that that warrantless search did not fall within any of the recognized exceptions to the warrant requirement. We are not persuaded that the trial court improperly denied the motion to suppress.[5]

---

[3] Additional facts will be set forth where they are relevant to each issue.

[4] The fourth amendment to the United States constitution, made applicable to the states through the due process clause of the fourteenth amendment in *Wolf* v. *Colorado,* 338 U.S. 25, 28, 69 S. Ct. 1359, 93 L. Ed. 2d 1782 (1949), provides in pertinent part: " 'The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .' " *State* v. *Cofield,* 220 Conn. 38, 46 n.7, 595 A.2d 1349 (1991); *State* v. *Leonard,* 31 Conn. App. 178, 185 n.8, 623 A.2d 1052 (1993).

Article first, § 7, of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

[5] Other than a citation to article first, § 7, of the state constitution, the defendant has failed to provide us with a separate state constitutional analysis to support his claim. Accordingly, we choose to limit our analysis to federal constitutional law. *State* v. *Reddick,* 224 Conn. 445, 463 n.22, 619 A.2d 453 (1993); *State* v. *Velez,* 30 Conn. App. 9, 22 n.7, 618 A.2d 1362, cert. denied, 225 Conn. 907, 621 A.2d 289 (1993).

At the suppression hearing, the court was presented with the following testimony. The defendant owned a 1988 Subaru that he purchased in New Hampshire and financed through the Ford Credit Company. He possessed the only key to the automobile. Because the defendant was delinquent in his payments for the car, Ford sought to repossess it.

On May 10, 1989, Partridge received a call and subsequently a facsimile from Ford instructing him to repossess the defendant's car. Following his usual practice, Partridge went to the local police station to inform the police that he would be repossessing an automobile. Dave Nicosia, an agent at Ford, had informed him that the owner of the car was dangerous and had previously been involved in a shooting. To avoid breaching the peace and for his own protection, Partridge occasionally requests that police accompany him to repossess a car. Partridge spoke with the desk sergeant and, at Partridge's request, an officer was sent to accompany him to repossess the defendant's automobile.

Partridge went to 54 Roosevelt Drive in Middletown, the defendant's girl friend's address. He located the vehicle by its vanity license plate and vehicle identification number. Partridge then hooked up the vehicle to the wrecker and towed it to the Middletown police department.

Partridge testified that he normally tows an automobile to the local police station as he did here. There he fills out paperwork and inventories the repossessed automobile. Most of the companies that request his services require that Partridge inventory the contents of the car to determine the presence of firearms, narcotics, or other contraband. These companies also require that if firearms, narcotics, or other contraband are discovered during inventory that Partridge turn the items over to the police.

Partridge gained entry to the locked automobile and inventoried the passenger compartment, the trunk, and the locked glove compartment. Inside the glove compartment, he found a tinfoil package. At first, Partridge thought it might be a brownie or someone's lunch. As he unwrapped the tinfoil, he became suspicious and handed the package to Anderson, who was standing nearby. Anderson continued to unfold the tinfoil and discovered a large rock substance. Partridge testified that Anderson in no way assisted him in conducting the inventory.

After hearing the evidence and reviewing exhibits, the court denied the defendant's motion to suppress. The court found that there was no action on the part of the police, the role of the police was merely incidental, and this was an action by a third party following his usual practice and procedures.

The fourth and fourteenth amendments proscribe unlawful searches by governmental officials. *Coolidge* v. *New Hampshire,* 403 U.S. 443, 488, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971). In order to exclude the evidence, the defendant must demonstrate that the police acted in some unconstitutional way. Id. It is "no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals." Id. "[A] wrongful search or seizure conducted by a private party does not violate the Fourth Amendment and . . . such private wrongdoing does not deprive the government of the right to use evidence that it has acquired lawfully." *Walter* v. *United States,* 447 U.S. 649, 656, 100 S. Ct. 2395, 65 L. Ed. 2d 410 (1980).

The acts of private citizens, however, can become state action when they act as agents or instruments of the state. *Coolidge* v. *New Hampshire,* supra, 487

(wife's voluntary action in turning over to police her husband's guns and clothing did not constitute a search and seizure by the government). The test of whether a private citizen is acting as a governmental agent is "whether [the private citizen] in light of all the circumstances of the case, must be regarded as having acted as an 'instrument' or agent of the state . . . ." Id. In applying this test, we consider whether private citizens are performing a function akin to a governmental function such as criminal investigation and whether they are acting on the order, instruction, or request of a government officer. See id., 489.

Partridge was privately employed. In inventorying the car, he was not performing a function akin to a governmental function such as investigation of a crime. Rather, he was attempting to protect the defendant's property. Even if we assume that he was performing a function akin to a governmental function in inventorying the contents of the defendant's car and turning over contraband, firearms and narcotics found, there was no state action because Partridge was not acting as an agent or instrument of the state. Partridge testified that Anderson did not participate or assist him in any way during the inventorying of the defendant's automobile. Anderson stood nearby merely to protect the chain of custody should any contraband be found. There was no evidence that Anderson ordered, requested, or instructed Partridge to search the automobile or the glove compartment for evidence of a possible crime. When Partridge presented the police officer with the tinfoil package, the officer was not required to stop Partridge or to avert his eyes. See id.

The trial court properly denied the defendant's motion to suppress.

## II

The defendant next claims that the trial court should have excluded the narcotics because the state failed to

establish that the evidence was in an unchanged condition. He asserts that since no witness could testify to the weight of the narcotics seized from the car on May 10, 1989, or explain why a discrepancy in weights existed, the court had no reasonable basis for finding that the evidence had not been altered. He also asserts that the chain of custody was not established. The defendant therefore argues that the evidence of the narcotics should have been excluded. We do not agree.

Additional facts are necessary to resolve this issue. After Partridge handed Anderson the package, Anderson showed it to his field supervisor, Sergeant Christopher Barrow. Barrow helped Anderson perform field tests on the substance found in the package. The field tests revealed that the package contained cocaine. In Barrow's presence, Anderson weighed the tinfoil package and its contents together because he feared losing some of the evidence. Anderson tagged the package and inadvertently wrote on the tag that the package weighed .86 grams. Barrows and Anderson each testified that Anderson must have misplaced the decimal point when recording the weight on the tag because the scale weighed items only to tenths of a gram. Barrow testified that he specifically remembered that there was a substantial amount. During the trial, Anderson weighed the package and found that it weighed 8.1 grams.

Anderson placed the package in an envelope, which he sealed, tagged with the date and the accused's name, and initialled. Anderson and Barrow then placed the envelope in a lockbox to which Officer Rich Augeri had the only key.

On May 11, 1989, Augeri gave the envelope to a courier, Buzz Nielson, to take to the state laboratory. At the laboratory, the evidence was assigned a laboratory number. The substance was weighed without the tin-

foil packaging and was found to weigh 5.48 grams. The toxicologist also confirmed the presence of cocaine that was 86.46 percent pure. The toxicologist placed the package in the envelope. He signed and dated the tape on the back of the envelope. Augeri picked up the envelope from the state laboratory.[6]

The court overruled the defendant's objection that the state had failed to establish the chain of custody over the narcotics in the tinfoil package.[7] The defendant excepted to this ruling.

We afford a trial court's rulings on the admissibility of evidence great deference. *State* v. *Sharpe,* 195 Conn. 651, 659, 491 A.2d 345 (1985); *State* v. *Johnson,* 162 Conn. 215, 233, 292 A.2d 903 (1972); *State* v. *Barnes,* 27 Conn. App. 713, 717, 610 A.2d 689, cert. denied, 223 Conn. 914, 614 A.2d 826 (1992); *State* v. *Burns,* 23 Conn. App. 602, 614, 583 A.2d 1296 (1990). We will not disturb such rulings absent a showing of a clear abuse of the trial court's discretion. See *State* v. *Moye,* 214 Conn. 89, 96, 570 A.2d 209 (1990); *State* v. *Barnes,* supra.

---

[6] At trial, Frank Violissi, a Middletown police sergeant with extensive training in narcotics investigations, testified that dealers would not usually sell 86.46 percent pure cocaine on the street. Rather, they would cut the purity of the cocaine to anywhere between 3 and 50 percent. The usual purity to which dealers cut the cocaine is 20 percent. By cutting the purity of the cocaine, dealers increase the amount that they could sell. He testified that the value of one gram of cocaine varies between $80 and $120. The value of eight grams would be between $800 and $1200.

[7] The court overruled the defendant's objection and found that "based on the weighing process and current weight and given the fact that the testimony seems clear, whatever the substance was that was in the foil and that some has been consumed in the process of testing, I'm satisfied that what occurred was a writing error in writing down the tenths versus hundredths.

"So, I think—the chain of custody also seems clear, and really the issue is whether it was less than an ounce or substantially more than one gram rather, and I'm satisfied what happened was a—weighing to paper error, and it [weighed], in fact, 8.6 [grams].

"It is a full exhibit. I think the chain of custody has been satisfied."

Our review of the record leads us to conclude that the trial court did not abuse its discretion in finding that the state had sufficiently laid a proper foundation for the admission of the exhibit. On the basis of the facts before it, the trial court could properly credit the officers' testimony that there was a writing error after they weighed the narcotics in its packaging. The trial court also observed Anderson reweigh the package. It heard testimony that the scale used by the officers in Middletown weighs evidence only to the nearest tenth and not hundredth. The court reasonably could find that the chain of custody was established.

The trial court did not abuse its discretion and the defendant's claim to the contrary is without merit.

### III

The defendant further asserts that the state introduced insufficient evidence from which to convict him under General Statutes § 21a-278 (b).[8] He asserts that the state failed to present evidence demonstrating that he had exclusive possession of the car and that as a result, the court should have granted his motion for judgment of acquittal on the charge of possession with intent to sell as a matter of law.[9] We disagree.

---

[8] General Statutes § 21a-278 (b) provides in pertinent part: "(b) Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any narcotic substance, hallucinogenic substance other than marijuana, amphetamine-type substance, or one kilogram or more of a cannabis-type substance except as authorized in this chapter, and who is not at the time of such action a drug-dependent person, for a first offense shall be imprisoned not less than five years nor more than twenty years; and for each subsequent offense shall be imprisoned not less than ten years nor more than twenty-five years. . . ."

[9] The defendant does not claim that the jury was not permitted to draw an inference of possession with intent to sell based on the amount of narcotics found in the car.

"To determine the sufficiency of the evidence to sustain a conviction, we apply a twofold test. . . . We first construe the evidence in the light most favorable to sustaining the verdict. . . . We then determine whether, from that evidence and all the reasonable inferences which it yields, [the jury] could reasonably have concluded that the defendant was guilty beyond a reasonable doubt. . . . In this examination, we consider whether the [trier] could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt . . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Maxwell*, 29 Conn. App. 704, 708, 618 A.2d 43 (1992), cert. denied, 225 Conn. 904, 621 A.2d 287 (1993).

"When applying the sufficiency of the evidence test, the court must ensure that [e]ach essential element of the crime charged . . . be established by proof beyond a reasonable doubt, and although it is within the province of the [trier] to draw reasonable, logical inferences from the facts proven, [it] may not resort to speculation and conjecture. . . . Where it cannot be said that a rational trier of fact could find guilt proven beyond a reasonable doubt, then, a conviction cannot constitutionally stand, as it is violative of due process under the fourteenth amendment. . . . [T]he burden rested upon the prosecution to prove the guilt of the accused, i.e., to prove each material element of the offense charged beyond a reasonable doubt." (Citations omit-

ted; internal quotation marks omitted.) Id., 708–709; *State* v. *Cruz,* 28 Conn. App. 575, 579, 611 A.2d 457 (1992).

To prove possession of a narcotic substance, the state must establish beyond a reasonable doubt that the accused knew of the character of the drug and its presence and exercised dominion and control over it. *State* v. *Delossantos,* 211 Conn. 258, 277–78, 559 A.2d 164, cert. denied, 493 U.S. 866, 110 S. Ct. 188, 107 L. Ed. 2d 142 (1989); *State* v. *Alfonso,* 195 Conn. 624, 633, 490 A.2d 75 (1985); *State* v. *Cruz,* supra.

The evidence here was sufficient for the jury to have found that the state had established beyond a reasonable doubt that the defendant possessed the narcotics found in the locked glove compartment of his automobile. Unlike the defendant in *State* v. *Cruz,* supra, the defendant here was in exclusive possession of the automobile and had exclusive access to the glove compartment.[10] The defendant owned the 1988 four door silver Subaru GL in which the narcotics were found. He possessed the only key to the automobile and its glove compartment. While others may have used the automobile, they did so with the defendant's permission. The automobile was found outside of the defendant's residence at 54 Roosevelt Drive in Middletown. The drugs were found in a locked glove compartment with the defend-

---

[10] In *State* v. *Cruz,* 28 Conn. App. 575, 611 A.2d 457 (1992), the defendant was charged with possession of less than four ounces of marijuana. In an automobile driven by the defendant, police officers found a marihuana seed in the pleat of the rear seat cushion. The defendant was not in exclusive possession of the automobile. At the time of his arrest, he had a passenger with him. The state also failed to demonstrate that the defendant owned the vehicle in which the drugs were found. The evidence in *Cruz* led us to conclude that the state failed to establish that the defendant had actual or constructive possession of the seed. The evidence fell short of proof beyond a reasonable doubt. See also *State* v. *Santiago,* 17 Conn. App. 273, 278, 552 A.2d 438 (1989) (while the defendant owned the car, he was not in exclusive possession because another occupant was in the vehicle).

ant's personal papers. On the basis of the evidence before it, the jury could reasonably infer that because the defendant had the only key to the glove compartment, he had control over it and knew of its contents.

The defendant's claim that the state produced insufficient evidence to convict him under General Statutes § 21a-278 (b) is without merit. The trial court properly denied the defendant's motion for acquittal.

## IV

The defendant next asserts that the trial court's denial of his request to remove counsel and for a continuance denied him his due process rights. He argues that the trial court could not have reasonably concluded that the breakdown of communication between him and his attorney was not genuine. He posits that the trial court should have granted his motion to dismiss counsel and allowed him a reasonable continuance to hire a new attorney. We are unpersuaded.

Additional facts are necessary to a resolution of this claim. After the jurors had been selected, but before they were sworn, the defendant informed the court that he did not want his counsel to represent him because there were no African-Americans on the jury.[11] The

---

[11] The following exchange occurred between the court and the defendant prior to the jury being sworn:

"[The Defendant]: . . . Couple of problems. There was no blacks on the jury, and I don't think [counsel] should represent me in this case. I'd like to have more time to get another attorney.

"[The Court]: What's the reason for that?

"[The Defendant]: A couple of people w[ere] picked that I didn't agree. I just feel that he's not doing his job.

"[The Court]: Well, regarding the first issue you raised, there was one black person on the jury . . . and it was your motion—your initiation through your attorney to have that person excused and it sounded like for a very good reason. However the jury is selected. It was properly selected. There's nothing unlawful about the jury. You might have a preference to have this or that on the jury but there is no right to that so that it is not a reason not to proceed with the case. . . . The second issue, [counsel]

defendant's counsel also expressed some concern about continuing as trial counsel. He stated that he was concerned about how cooperative the defendant would be toward him and how much the defendant would assist him in the defense. The trial court denied both the motion to dismiss counsel and for a continuance.

The trial court has discretion to decide whether the circumstances that occur during a particular trial warrant the appointment of a new counsel. *Sekou* v. *Warden,* 216 Conn 678, 686, 583 A.2d 1277 (1990); *State* v. *Gonzalez,* 205 Conn. 673, 683, 535 A.2d 345 (1987); *State* v. *Bethea,* 24 Conn. App. 13, 22, 585 A.2d 1235, cert. denied, 218 Conn. 901, 588 A.2d 1076 (1991). If supported by a substantial reason the request for substitution of counsel should be granted. *State* v. *Gonzalez,* supra; *State* v. *Drakeford,* 202 Conn. 75, 83, 519 A.2d 1194 (1987); *State* v. *Bethea,* supra, 23. Although under some circumstances a complete breakdown in communication between a defendant and his counsel may warrant appointment of new counsel; *State* v. *Gonzalez,* supra, 684; *State* v. *Gethers,* 193 Conn. 526, 543,

has represented you for a year now, and, as far as I can determine from looking at the trial and hearing comments, he's doing a perfectly fine job. One reason why you pay an attorney is to use his expertise. Obviously, he consults with you at all critical stages. I was not here during jury selection [a different judge presided over jury selection], but I'm sure he consulted with you. There may have been a time he thought you should rely on his experience and expertise in selecting one juror or another, but I don't see that as any basis not to proceed with the case. The case is now about to begin, and we must begin this morning.

"[The Defendant]: Yes, sir.

"[The Court]: . . . I'll be happy to give you all the time you need to [confer] so your wishes can be taken into account. I will not grant a continuance at this point.

"[The Defendant]: I don't want him as my lawyer. . . .

"[The Court]: That's unfortunate. You hired him; he's been with you for a long time. I'll not grant a motion for continuance at this point. You selected [counsel]. He's doing a perfectly fine job, and you don't have a right on the day when [the] trial [is] about to begin, the jury ready to be sworn in, to decide you don't want to go forward with the case. So the motion is denied."

480 A.2d 435 (1984), it may not be used to achieve delay. *State* v. *Gonzalez,* supra, 683–84. We must distinguish between a substantial and timely request for new counsel pursued in good faith, and one made for insufficient cause on the eve of or in the middle of trial. *State* v. *Drakeford,* supra. "While a criminal defendant's right to be represented by counsel implies a degree of freedom to be represented by counsel of defendant's choice . . . this guarantee does not grant a defendant an unlimited opportunity to obtain alternate counsel on the eve of trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Gonzalez,* supra, 683; *State* v. *Drakeford,* supra. It is within the trial court's discretion to determine whether a factual basis exists for appointing new counsel. *State* v. *Drakeford,* supra. "[A]bsent a factual record revealing an abuse of [the court's] discretion, the court's failure to allow new counsel is not reversible error." Id.; see *State* v. *Crenshaw,* 210 Conn. 304, 314, 554 A.2d 1074 (1989).

In *State* v. *Drakeford,* supra, the defendant chose his own lawyer who was given special public defender status. The attorney represented the defendant for approximately one year and took part in a hearing on probable cause and filed a considerable number of pretrial motions. The record in *Drakeford* disclosed no evidence of difficulty between counsel and client until the trial started. While jurors were being selected, the defendant claimed a difference of opinion with his lawyer over jury selection. In that case, our Supreme Court noted that differences of opinion over trial strategy are not unknown and do not necessarily compel the appointment of new counsel.

The defendant here claimed at trial that his attorney selected a jury without African-American representation. He asserted that he had a difference of opinion with his lawyer about who should be selected for the jury. The court noted that the defendant's coun-

sel had in fact selected an African-American, but the defendant encouraged him to have that juror excused. As in *State* v. *Drakeford,* supra, there was no evidence in this case that the defendant and his counsel had difficulty dealing with each other prior to jury selection. Furthermore, as in *Drakeford,* counsel had represented the defendant for over one year and had competently conducted himself in prior stages of the prosecution. Moreover, the trial court noted that the defendant was not entitled to a continuance minutes before the jury was to be sworn. The trial court did not abuse its discretion in determining that differences in opinion over trial strategy do not compel the appointment of new counsel.

We conclude that the defendant has not met the substantial burden of showing that the court abused its discretion in failing to relieve counsel or grant a continuance for purposes of replacement of counsel.

V

The defendant argues that the trial court's charge that improperly highlighted the admission of a witness' prior inconsistent statement prejudiced his defense.[12]

---

[12] During the course of the trial, Flood testified under oath that on March 5, 1989, at the time of the alleged shooting, he was standing near the defendant. He said the defendant neither possessed a gun nor fired it at the victims. On cross-examination, Flood testified that he had given the police two written statements, one on March 5, 1989, and another on March 8, 1989. The state offered the March 8, 1989 statement as a full exhibit. No where in his written statements did the witness state that the victim, Jenkins, was involved in a fight that took place the night before the shooting. The state also questioned the witness about alleged inconsistencies between his statements and testimony on direct examination concerning his whereabouts before and after the shooting, where the defendant's car was parked, whether he and the defendant were ever in the car together on the day of the shooting. The state also cross-examined the witness about his testimony at trial concerning events that were absent from his written statements to the police such as whether the defendant called Jenkins a "bitch," and whether the defendant had a gun.

The defendant claims that because this improper charge prejudiced the jury against the testimony of his lone corroborating witness, he was convicted of risk of injury to a child and reckless endangerment. We do not agree.

During its charge to the jury, the court discussed impeachment by way of inconsistent statements.[13] The defendant excepted to the charge concerning the referral to inconsistent statements made by Flood.[14]

[13] The court stated that impeachment by way of inconsistent statements "arose, I think, just one time that I recall, that was this morning with Mr. Flood's testimony. In specific terms, where I told you that there was actually admitted a prior inconsistent statement, however, you may consider this instruction whenever either party offered the matter of a witness making prior statements that were inconsistent with the in-court testimony. I think there were a lot of witnesses that were questioned along those lines. A witness may be discredited or impeached by contradictory evidence or by evidence at some other time the witness said or did something, or failed to say or do something which is inconsistent with the witness' present testimony. If you believe that any witness has been impeached and thus discredited, it is your exclusive province to give the testimony of that witness such credibility, if any, as you think it deserves. If a witness is shown knowingly to have testified falsely concerning any material matter, you have a right to distrust such witness or testimony and you may reject all or any part of the testimony of that witness or give it such weight as you think it deserves. An act or omission is knowingly done if done voluntarily and intentionally and not because of mistake or accident or other innocent reasons. I'll just remind you that that document, you have a prior statement in writing by Mr. Flood, was offered not to prove the truth of what was said in the statement but as evidence offered by the state that he said something inconsistent with his in-court testimony and you must limit your consideration of it to that."

[14] In responding to this exception outside of the juror's presence, the court noted that it referred to Flood's inconsistent testimony because "of the offer of a written document, I wanted to be sure [the jury] did not consider [the written document] for the truth, but I believe I did go on to say that there were a number of inconsistent statements offered by other witnesses."

During the trial, the court also cautioned the jury that the "statement by Mr. Flood on a prior occasion is offered by the state just because it is claimed that it contains statements inconsistent with his in-court testimony. So it comes in on the issue of credibility of the in-court testimony. So what is said here—It's not offered for the truth of what was said on this prior occasion but to show that there may have been inconsistent statements with the in-court testimony."

The trial court has not only the right but also the duty to comment on the evidence. *State* v. *Marra,* 222 Conn. 506, 538, 610 A.2d 1113 (1992); *State* v. *Hernandez,* 218 Conn. 458, 461–62, 590 A.2d 112 (1991); *State* v. *James,* 211 Conn. 555, 571, 560 A.2d 426 (1989); *State* v. *Rumore,* 28 Conn. App. 402, 411, 613 A.2d 1328, cert. denied, 224 Conn. 906, 615 A.2d 1049 (1992). "In marshaling the evidence, the court must be careful not to imply any favor or criticism of either side." *State* v. *Rumore,* supra; *State* v. *Hernandez,* supra, 463. To avoid the danger of improper influence on the jury, a recitation of the evidence "should not be so drawn as to direct the attention of the jury too prominently to the facts in the testimony on one side of the case, while sinking out of view, or passing lightly over, portions of the testimony on the other side, which deserve equal attention." (Internal quotation marks omitted.) *State* v. *Hernandez,* supra, 462.

"The principal function of a jury charge is to assist the jury in applying the law correctly to the facts which they might find to be established . . . and therefore, we have stated that a charge must go beyond a bare statement of accurate legal principles to the extent of indicating to the jury the application of those principles to the facts claimed to have been proven." (Citation omitted; internal quotation marks omitted.) Id.; *State* v. *Wolff,* 29 Conn. App. 524, 531, 616 A.2d 1143 (1992). When reviewing the court's instruction, our role is to determine "whether, taken as a whole, [it] fairly and adequately present[s] the case to a jury in such a way that injustice is not done to either party under the established rules of law." (Internal quotation marks omitted.) *State* v. *Tatum,* 219 Conn. 721, 734, 595 A.2d 322 (1991); *State* v. *Plude,* 30 Conn. App. 527, 537–38, 621 A.2d 1342, cert. denied, 225 Conn. 923, 625 A.2d 824 (1993); *State* v. *Andrews,* 29 Conn. App. 533, 540, 616 A.2d 1148 (1992), cert. denied, 224

Conn. 924, 618 A.2d 531 (1993); *State* v. *Wolff,* supra. If injustice was done, "[t]he defendant is entitled to a new trial in such circumstances . . . where he can show that prejudice resulted from the court's actions." (Internal quotation marks omitted.) *State* v. *Hernandez,* supra, 465.

We cannot say that the charge as given did any injustice or caused any prejudice to the defendant. Here, the trial court stated that its instruction concerning inconsistent statements applied to any inconsistent statements made by any of the witnesses. It instructed the jury that "[it] may consider this instruction whenever either party offered the matter of a witness making prior statements that were inconsistent with the in-court testimony. I think there were a lot of witnesses that were questioned along those lines."

The trial court did not abuse its discretion and, thus, the defendant's claim is without merit.

## VI

The defendant's final assertion is that the trial court improperly granted the state's pretrial motion to consolidate two informations filed against him and denied his motion to sever. He asserts that the resulting prejudice was beyond the curative power of the trial court's instructions. We are unpersuaded.

Prior to trial, in January, 1990, the state filed a motion to consolidate for trial the two informations filed against the defendant and the defendant filed a motion to sever the trials. In the interest of judicial economy, the court granted the state's motion to consolidate and denied the defendant's motion to sever, finding that the defendant had failed to establish that he would be prejudiced by the joinder of the information. The court also noted that the jury could easily distinguish the cases and any prejudice that might occur to the defendant could be cured by its charge to the jury.

The trial court has broad discretion on whether to join or sever separate charges for trial. Practice Book § 829;[15] *State* v. *Boscarino,* 204 Conn. 714, 720, 529 A.2d 1260 (1987); *State* v. *Rose,* 29 Conn. App. 421, 429–30, 615 A.2d 1058, cert. denied, 224 Conn. 923, 618 A.2d 529 (1992); *State* v. *Carpenter,* 19 Conn. App. 48, 62, 562 A.2d 35, cert. denied, 213 Conn. 804, 567 A.2d 834 (1989). "The court enjoys broad discretion which, absent manifest abuse, an appellate court may not disturb." *State* v. *Owens,* 25 Conn. App. 181, 193, 594 A.2d 991, cert. denied, 220 Conn. 910, 597 A.2d 337 (1991); *State* v. *King,* 187 Conn. 292, 299, 445 A.2d 901 (1982). To demonstrate that the trial court abused its discretion, the defendant bears the heavy burden of showing that a denial of severance resulted in substantial injustice beyond the curative power of jury instructions. *State* v. *Herring,* 210 Conn. 78, 95, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989); *State* v. *Rose,* supra, 430. Whether a joint trial will be substantially prejudicial to the defendant's rights means something more than that it will be less advantageous to the defendant. *State* v. *Rose,* supra; *State* v. *Bell,* 188 Conn. 406, 411, 450 A.2d 356 (1982).

Our Supreme Court has held that a trial court should consider several factors in determining whether severance is required. "These factors include: (1) whether the charges involved discrete, easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial. . . . If any or all of these factors are present, a reviewing court must decide whether the

---

[15] Practice Book § 829 provides: "The judicial authority *may,* upon his own motion or the motion of any party, order that two or more indictments or informations or both, whether against the same defendant or different defendants, be tried together." (Emphasis added.)

trial court's jury instructions cured any prejudice that might have occurred." (Citations omitted; internal quotation marks omitted.) *State* v. *Jennings,* 216 Conn. 647, 658, 583 A.2d 915 (1990); *State* v. *Rose,* supra.

Our review of the record leads us to conclude that joinder did not result in substantial injustice. Here, the charges involved discrete, easily distinguishable factual scenarios. The defendant was charged in one information with criminal attempt to commit assault in the first degree, risk of injury to a child and reckless endangerment. In the second information, he was charged with possession with intent to sell of a narcotic substance and improper use of registration. See *State* v. *Jennings,* supra (the charge of assault in the first degree and kidnapping in the first degree in one information and of criminal attempt to commit assault in the first degree against the same victim and criminal trespass in the first degree in another information were distinct and distinguishable factual scenarios); *State* v. *King,* supra, 302 (evidence offered for charges of burglary in the third degree and larceny in the third degree in one information and of possession of heroin and cocaine in a separate information are "simple, separable and straightforward"); *State* v. *Owens,* supra, 194 (charges of larceny in the first degree and carrying a weapon in a motor vehicle are not similar and easily distinguishable factual scenarios); compare *State* v. *Boscarino,* supra, 722–23 (four cases all of which involved sexual assaults by knife wielding assailant whose victims described him as having similar features did not involve discrete, easily distinguishable factual scenarios).

The crimes were also not of a violent nature and did not involve brutal or shocking conduct on the defendant's part. See *State* v. *Rose,* supra, 431 (two separate charges of robbery in the first degree were not of a violent nature, nor did they involve brutal or shocking conduct by the defendant); *State* v. *Owens,* supra

(charges of larceny in the first degree and carrying a weapon in a motor vehicle were not of a shocking or violent nature).

Furthermore, the trial was neither complex nor long; it was completed after the jury heard nineteen witnesses during five days of trial. See *State* v. *Jennings,* supra, 659 (trial not unduly complex or long where fourteen witnesses testified during five days of trial); *State* v. *Herring,* supra, 97 (trial not unduly complex or long where twenty-three witnesses testified during eight days of trial); *State* v. *Rose,* supra (trial not unduly complex or long where six witness testified and twenty-three exhibits were offered during two days of trial); *State* v. *Owens,* supra (trial not complex and evidence was presented in orderly manner); compare *State* v. *Boscarino,* supra, 723–24 (duration and complexity of trial that lasted ten weeks during which the jury heard fifty-five witnesses testify and examined sixty-six exhibits enhanced likelihood that jury would weigh the evidence against the defendant cumulatively).[16]

We conclude that the trial court's decision to consolidate the charges for trial did not result in substantial

---

[16] Moreover, even if the defendant were able to meet his heavy burden of demonstrating prejudice, this prejudice was cured by the trial court's instructions. Here, the trial court carefully explained to the jury that in this case, the defendant was charged in two informations with separate and distinct offenses. He cautioned the jury that it was to consider each of the informations separately, that evidence of guilt in one offense may not be considered as evidence of guilt in another offense, that if the defendant was guilty beyond a reasonable doubt of one offense they could not necessarily infer that he was guilty beyond a reasonable doubt of the offenses in the other information. The court also cautioned the jury about the defendant's right to testify. The court charged that although the defendant chose to testify in the case involving risk of injury, reckless endangerment, and attempted assault, he was not required to testify in the possession with intent to sell case. It stated that the jurors may not draw any unfavorable inferences from the fact that the defendant chose not to testify in the possession with the intent to sell case, that the state must prove him guilty beyond a reasonable doubt, and that the defendant has no burden to prove his innocence.

injustice. The trial court did not abuse its discretion in denying the defendant's motion to sever.

The judgments are affirmed.

In this opinion the other judges concurred.